UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WEBMD, LLC, a Delaware Limited Liability Company,<br><br>              Plaintiff,<br><br>        -against-<br><br>HEIDI ANDERSON and TIME INC., a Delaware Corporation,<br><br>              Defendants. | Case No. 17-cv-03456-NRB<br><br>**AMENDED COMPLAINT**<br><br>(JURY TRIAL DEMANDED) |

Plaintiff WebMD, LLC ("WebMD"), by its attorneys, Browne George Ross LLP, for its Complaint against Heidi Anderson ("Anderson") and Time Inc. alleges as follows:

**PARTIES**

1.      Plaintiff WebMD is a Delaware limited liability company authorized to do business in the State of New York, with its principal place of business at 395 Hudson Street, New York, New York 10014

2.      Defendant Heidi Anderson is an individual residing, upon information and belief, at 825 Surrey Lane, Glenview, Illinois, 60025, but at all times relevant to this action, performed services for WebMD in both Illinois and New York.

3.      Defendant Time Inc. is a Delaware corporation authorized to do business in the State of New York, with its principal place of business at 225 Liberty Street, New York, New York 10281.

**JURISDICTION AND VENUE**

4.      This Court has personal jurisdiction over Time Inc. in that it is domiciled in the State of New York.  This action is currently in this Court as a result of Anderson's removal of the original complaint against her only, on the basis of complete diversity of citizenship between the parties. The original complaint had been filed in the Supreme Court of the State of New York, County of

767623

New York, Index No. 651949/2017.  This Amended Complaint adds Time Inc. as a defendant, so that complete diversity of citizenship no longer exists, in that WebMD and Time Inc. are both Delaware entities with their principal places of business in New York; since the Court no longer has subject matter jurisdiction over this action it must be remanded to the New York state court.

5.     This Court has personal jurisdiction over Anderson pursuant to the several agreements described below, in which she has agreed that she is subject to the personal jurisdiction and venue of the courts located in New York.  In addition, at all times relevant to the claims made herein, Anderson had regular and frequent contacts with WebMD's New York City offices and was present there several times a month during the course of her employment.  Anderson was provided office space in WebMD's New York City offices.  Anderson's supervisor, Steven Peraino, was (and still is) located in the New York City office.  Anderson frequently travelled to New York City to meet with Mr. Peraino, to attend meetings with WebMD sales and account management personnel, and to visit and solicit clients and prospective clients.  In addition, several WebMD employees reported to Anderson, including Mathew Reynders, David Bernstein and Jeff Christian, all of whom were located in New York.

6.     Venue is proper in this Court pursuant to CPLR § 503(a) and 28 U.S.C. § 1391(b), in that WebMD and Time Inc. both reside in New York County and this District, in which a substantial part of the events or omissions giving rise to the claims occurred.

<u>FACTS COMMON TO ALL CAUSES OF ACTION</u>

A.     <u>Background</u>

7.     WebMD and its affiliates are leading providers of health information to consumers, physicians and other healthcare professionals through its websites, mobile apps and health-focused publications.  WebMD engages consumers, physicians and other healthcare professionals across a

multi-platform experience, allowing it to empower and enable health decisions anytime and anywhere.

8.      Advertisers and sponsors use the WebMD family of companies to reach and engage healthcare professionals and consumers who are interested in healthy living, wellness, diseases and conditions, and other health-related topics, and WebMD generates revenue from advertising and sponsorships paid by these advertisers and sponsors.

9.      The WEBMD brand has become famous with consumers as a leading source for reliable health and medical information.

10.     In or about May 2005, WebMD conceived and launched a printed consumer magazine (the "WebMD Magazine") branded with the WEBMD trademark, as a way to expand the WEBMD brand beyond its renown as an online resource for health and medical information.  The WebMD Magazine was made available to patients in waiting rooms of physicians and other health care professionals.

11.     The WebMD Magazine was provided free of charge to health care providers (multiple copies to each office), with the expectation that it would be set out in waiting rooms for patients to read.

12.     The WebMD Magazine offered a unique vehicle for advertisers to directly target patients interested in health-related issues through a consumer publication intended to reach them while waiting to receive health care and engage with their physicians or other healthcare professionals.

13.     Through distribution of the WebMD Magazine, WebMD also gathered and maintained specialty and other information regarding the healthcare professionals receiving the

WebMD Magazine, which allowed advertisers to reach even more precisely readers interested in specific medical conditions.

14.     WebMD used and continues to use this information to create specialty sections of the WebMD Magazine tailored to specific condition areas, which enables advertisers to more effectively reach consumer segments interested in particular medical conditions.

15.     In addition, given the synergies between the WebMD Magazine and WebMD's online businesses, WebMD was capable of selling advertising in package arrangements that included its online properties and the WebMD Magazine as an additional benefit to advertisers, such as pharmaceutical companies, medical device, and other companies that previously only advertised online with WebMD.

16.     Over the more than 10 years WebMD has invested in and grown the WebMD Magazine, it has developed a unique and valuable business.  The WebMD Magazine today generates millions of dollars per year in revenue on its own, and has facilitated millions of dollars of additional revenue for WebMD in the form of advertising and sponsorship on WebMD's online sites.

17.     As the covers below show, the WebMD Magazine merges WebMD's reputation as a leading health information provider with popular culture, making it an informative and attractive publication for patients to read while in the waiting room.



18.     The trade secrets developed over the period that the WebMD Magazine has been in print and its unique distribution model include such things as advertiser interests and objectives, advertising pricing models, advertiser lists and advertiser packages, and sales methods and practices, as well as physician and health care professional related information and marketing methods and materials directed specifically to healthcare professionals.  In addition, these trade secrets also include the methodologies and approaches utilized to measure the effectiveness of advertising campaigns.

## B.    Anderson

19.     From 2008 to 2016, Anderson worked for WebMD on the WebMD Magazine, and was responsible, in part, for the development of advertising programs intended to help grow the WebMD Magazine.

20.     Anderson was originally hired as Executive Director Integrated Consumer Solutions/Vice President Associate Publisher, WebMD Magazine in 2008.  She was promoted over the years until she ultimately held the executive title Vice President Strategic Accounts, Pharma Consumer and Magazine, for which she had primary front line responsibility to meet revenue goals

for advertising in the WebMD Magazine, to service the accounts of customers that advertised in the WebMD Magazine, and to conceive and implement strategic plans for WebMD in conjunction with advertisers to enhance the value of advertising in the WebMD Magazine.

21.    From early 2015 through her departure date in March 2016, Anderson held a senior executive sales position at WebMD.  Similarly, in this role, she was responsible for working with advertisers to place their advertisements on WebMD's online properties, and during this period, she worked closely with these advertisers to understand their objectives and to create online programs designed to reach their target audiences and to enhance the value of their advertising on WebMD's sites.  Based on her experience with the WebMD Magazine, she also continued to provide advice and support for the WebMD Magazine.

22.    Anderson was based out of Chicago, but since the WebMD Magazine and WebMD's sales personnel are based largely in New York City in WebMD's headquarters, Anderson traveled to New York City frequently, where she regularly worked for the WebMD Magazine and WebMD's online health information-related properties.

23.    In her various positions with WebMD as they related to the WebMD Magazine, Anderson became intimately familiar with the WebMD Magazine's business model, and had full access to the trade secrets developed by WebMD to maintain and grow the publication.  Anderson herself was instrumental in conceiving and implementing many plans and strategies that helped the WebMD Magazine grow and prosper, from 2008, when she joined the company after the launch of the WebMD Magazine, until her departure in 2016.

24.    For example, Anderson knows and helped to formulate many of WebMD's pricing models, and knows many of the special arrangements made by WebMD with its advertisers.

767623                                                                6

25.     Anderson also understands WebMD's cost structure for the WebMD Magazine, and has an intimate knowledge of WebMD's methods for attracting and maintaining advertisers.  This knowledge, if used for the benefit of a competitor such as Time Inc, would give any such competitor with such valuable information the ability to unfairly compete with WebMD.

26.     Similarly, as a senior sales executive at WebMD for its online properties, Anderson was also fully aware of WebMD's business model and had complete access to the trade secrets developed by WebMD to advance its online properties.  Anderson was present for and heard many WebMD presentations concerning business practices, pricing, advertisers, and other similar topics to which a third-party would not be privy.

27.     Therefore, as a condition of her employment, Anderson regularly executed and delivered to WebMD restrictive covenants, non-solicitation and non-competition agreements, as well as agreements by which she promised to keep business information of WebMD confidential.  These agreements required, among other things, that if Anderson left her employment at WebMD, for one year after departure she could not be engaged in a business which competes with the business in which WebMD is engaged, and she could never use trade secrets and confidential information of WebMD for or on behalf of anyone else.

28.     At all times during which Anderson was employed by WebMD, Anderson knew that WebMD was taking all steps reasonable and necessary to protect its trade secrets and unique business methods and models by the use of restrictive covenants, confidentiality agreements and non-disclosure agreements with senior employees like Anderson.

29.     In consideration of her non-compete and confidentiality agreements and her contributions to the development and growth of WebMD's business, including as it relates to the WebMD Magazine, Anderson was compensated in the form of salary and commissions.  In addition,

she received stock options on certain conditions, including that she abide by her restrictive covenant and non-disclosure obligations.

30.     Over the years, Anderson personally benefitted from her employment with WebMD and received more than two million dollars ($2,000,000) through salary, commissions and the exercise of stock options granted by WebMD and the sale of restricted stock issued by WebMD.

31.     Anderson executed and delivered multiple agreements over the course of her employment with WebMD which contained restrictive covenants and non-competition provisions, as well as solicitation and confidentiality restrictions, as a condition to her continued employment, and as a condition to the receipt of restricted stock and of stock options.

32.     Those agreements included annual Sales Compensation Plan Agreements (each, a "Sales Comp Agreement"), a Restricted Stock Agreement ("RSA") and Non-Qualified Stock Option Agreements (each, an "Option Agreement") (collectively, the "Agreements").

## C.     The Option Agreements

33.     Annexed to the RSA and each Option Agreement was a Restrictive Covenants Agreement, by which, as a condition for receipt of the restricted stock and options grants, Anderson acknowledged possession of WebMD trade secrets and proprietary information ("Confidential Information"), and agreed that both during and after employment to hold such Confidential Information "in a fiduciary capacity for the benefit of [WebMD] and its Affiliates and to safeguard all such [Confidential] Information."

34.     In the RSA and each Option Agreement, Anderson also agreed "that I will not directly or indirectly disclose or use any such Trade Secret and Proprietary Information to any third person or entity outside the Company and its Affiliates, except as may be necessary in the good faith performance of my duties for the Company and its Affiliates."

35.     Anderson also agreed in the RSA and each Option Agreement, "in order to protect the Company's Trade Secret and Proprietary Information and Third-Party Goodwill . . . that during my employment with the Company and for a period of one year after the date my employment with the Company is terminated for any reason (the 'Restricted Period'), I will not, without the Company's express written permission, directly or indirectly (including through the Internet), own, control, manage, operate, participate in, be employed by, or act for or on behalf of (as principal, agent, employee, consultant, director or otherwise), any 'Competitive Business' (as defined herein) located anywhere within the geographic boundaries of the United States, Canada and the world."

36.     Each of the Agreements also required the following:

> Notice to Future Employers.  For a period of two (2) years after my employment with the Company ends, I will inform each new employer, prior to accepting employment, of the existence and details of the covenants contained in this Annex A and will provide each such employer with a copy of this Annex.

37.     The RSA executed by Anderson also provided that WebMD is entitled to recoup any profits realized by Anderson from the exercise of options in WebMD securities should the following occur:

> In the event Holder breaches any restrictive covenants to which Holder is bound (including, without limitation, those set forth on Annex A), in addition to any other remedy available to the Company, any shares of Restricted Stock will be immediately forfeited without any notice or consideration being paid therefor *and the Company shall be entitled to recoup income realized upon the prior vesting of shares of Restricted Stock granted hereunder*.   By signing below, Holder acknowledges the representations and agrees to the covenants set forth on Annex A *as a condition to Holder's ability to have any rights hereunder*.   In addition, Holder acknowledges that Holder has read the covenants contained on Annex A and has had an opportunity to consult with an attorney of Holder's own choice (at Holder's expense) prior to signing and understands that signing this Agreement is a condition to any rights Holder may have under this Agreement. The covenants on Annex A do not super[s]ede or replace any other confidentiality, non-competition or non-solicitation agreement entered into between Holder and the Company (or any Affiliate thereof) to the extent

that such confidentiality, non-competition and/or non-solicitation agreement is more protective of the business of the Company and/or its Affiliates.

(Emphasis added.)

38.     The Option Agreements executed by Anderson also provided that WebMD is entitled to recoup any profits realized by Anderson from the exercise of options in WebMD securities should the following occur:

> In the event that you breach any restrictive covenants to which you are bound (including, without limitation, those set forth on Annex A), in addition to any other remedy available to the Company, the Option, whether or not vested, will immediately terminate without any notice or consideration being paid therefor *and the Company shall be entitled to recoup income realized upon the exercise of this Option*.   By signing below, you acknowledge the representations and agree to the covenants set forth on Annex A as a condition to your ability to exercise this Option or have any rights hereunder.   In addition, you acknowledge that you have read the covenants contained on Annex A and have had an opportunity to consult with an attorney of your own choice (at your expense) prior to signing and understand that signing this Agreement *is a condition to any rights you may have under this Agreement*.   The covenants on Annex A do not super[s]ede or replace any other confidentiality, non-competition or non-solicitation agreement entered into between you and the Company (or any Affiliate thereof) to the extent that such confidentiality, non-competition and/or non-solicitation agreement is more protective of the business of the Company and/or its Affiliates.

(Emphasis added.)

39.     Anderson realized more than $1,000,000 from the restricted stock grant and exercise of options while employed by WebMD (the "RS-Option Exercise Profit").

40.     In addition to any other remedies to which WebMD is entitled, WebMD is entitled to recoup the RS-Option Exercise Profit realized by Anderson on account of her breach of the restrictive covenants and non-competition agreements she signed and delivered while employed by WebMD.

41.     Anderson agreed to virtually identical restrictions in her Sales Comp Agreements, which contained similar Restrictive Covenant Agreements containing restrictions on the use of Confidential Information.

42.     Each Sales Comp Agreement contained a choice of New York law, a consent by Anderson to jurisdiction in the Courts of the State of New York, and an acknowledgment by Anderson that her execution and delivery of the Sales Comp Agreement "constitutes the minimum contacts necessary to make you subject to the personal jurisdiction and venue of the Federal and state courts located in New York."

43.     The Agreements all made it clear to Anderson that upon leaving WebMD, she could not take a position that might compete with WebMD for a period of one year after her departure, and that at no time would she be able to use Confidential Information for the benefit of a future employer.

44.     The Agreements also provided that "the Restricted Period shall be extended for a period of time equal to the period of time during which I breached the restrictions contained herein."

**D.     Time Inc.**

45.     According to its 2016 Annual Report, Time Inc., together with its subsidiaries, is a leading multi-platform media and content company that engages over 150 million consumers every month through its portfolio of premium news and lifestyle brands across a diverse set of interest areas.  Time Inc.'s influential brands include People, Time, Fortune, Sports Illustrated, InStyle, Real Simple, Southern Living, Entertainment Weekly, Food & Wine, Travel + Leisure, and Essence, as well as approximately 50 diverse titles in the United Kingdom.

46.     While Time Inc. does distribute magazines to the offices of doctors and health care professionals, it has generally done so through the offer of discounted professional subscription rates

for popular Time Inc. publications such as People, Sports Illustrated, and Time, and not through the free distribution of health specific publications to offices of physicians and medical service providers.

**E.    Anderson Joins Time Inc.**

47.    From June 2015 to February 2016, WebMD worked with the Time Inc. publication Sports Illustrated on a joint project sponsored by a pharmaceutical company (the "Joint Editorial Project").  WebMD and Time Inc. shared editorial content with each other, the WebMD content appearing in Sports Illustrated in its printed and electronic versions, and the Sports Illustrated content appearing in the WebMD Magazine and online at WebMD.  The WebMD content was focused on the health-related aspects of the injury suffered by a professional athlete and the treatment involved in returning him to competitive form.

48.    Anderson worked as the lead business side person on behalf of WebMD on the Joint Editorial Project.

49.    Upon information and belief, Anderson's work on the Joint Editorial Project ultimately led to her developing a relationship with Time Inc. that caused her to leave WebMD for a job at Time Inc.

50.    Time Inc. qualifies as a "competitive business" pursuant to the terms of the RSA and Option Agreements (a "Competitive Business").

51.    In March 2016, shortly after the conclusion of the Joint Editorial Project, Anderson gave notice to WebMD that she was leaving to take a position at Time Inc.

52.    Anderson knew and understood that she was bound by the multiple restrictive covenant, non-competition and non-solicitation provisions of the various Agreements she had signed and delivered to WebMD over the years, and that the right to retain the benefits of the restricted

stock and option grants she had previously received were expressly conditioned on her continued compliance with those provisions.

53.     When Anderson announced that she had accepted a position at Time Inc., Steve Peraino, her supervisor, reminded Anderson of her restrictive covenant, non-solicitation and confidentiality obligations, and that WebMD had concerns that her new position at Time Inc. would be a violation of these covenants and restrictions.  Peraino requested that Anderson advise WebMD what her role would be for Time Inc., so that WebMD could assess whether this role, in fact, was violative of her restrictive covenants.

54.     Following that conversation, Anderson advised Douglas Wamsley, WebMD's Co-General Counsel ("Wamsley"), that her new role was selling advertising across all Time Inc. properties, including health-related properties, and that she would be soliciting advertisers on behalf of Time Inc. that were customers and potential customers of WebMD.  Wamsley advised Anderson that her new role would constitute working for a Competitive Business with WebMD, and, accordingly, a violation of her restrictive covenant and non-solicitation obligations.

55.     Anderson then asked WebMD for a release from the restrictions and conditions in her Agreements so she could join Time Inc. unburdened by any constraints.

56.     WebMD refused Anderson's request, and advised Anderson that it intended to enforce its contractual rights.

57.     However, in good faith, in order to permit Anderson to work at Time Inc. while enabling WebMD to protect its interests, WebMD agreed to a limited waiver of the restrictive provisions of her WebMD Agreements on the following conditions:  (i) Anderson would not work at Time Inc. on any health-related Time Inc. properties, including Health.com and its related online and offline magazine; (ii) Anderson would not directly or indirectly solicit a limited number of

specifically identified entities designated on Attachment B to the March Letter Agreement (defined below) during the one year restricted period (the "Restricted Period"); and (iii) Time Inc. would be specifically notified about the limited release, and the conditions imposed on that limited release by WebMD to assure that Anderson did not use Confidential Information at Time Inc. or otherwise compete by working on health-related properties of Time Inc. for the Restricted Period.

58.     In addition, Anderson reaffirmed her continuing obligations under her various WebMD Agreements, including her obligation to maintain the confidentiality of all WebMD information and to not solicit WebMD employees and contractors.

59.     The terms and conditions of this limited waiver were set forth in a letter agreement dated March 21, 2016 between WebMD and Anderson (the "March Letter Agreement"), which expressly provided that "[b]y signing below, you [Anderson] acknowledge that you have provided a copy of this letter to Time."

60.     Anderson executed and delivered the March Letter Agreement to WebMD.

61.     As a result, Anderson was able to leave WebMD and join Time Inc. provided, as set forth in the March Letter Agreement, that she would not, among other restrictions, "perform any services for or on behalf of Health.com (including related magazine, online or offline), or for or on behalf of any other health-related property of Time."

**F.     The WebMD/Time Inc. Non-Disclosure Agreement**

62.     In the summer of 2016, WebMD was searching for a company to provide outside publication, distribution and editorial services for the Magazine.

63.     WebMD issued a written request for proposals which outlined the broad parameters of its requirements and sought bids from qualified providers (the "RFP").

64.     Before WebMD would consider any third-party as a possible provider of the services described in the RFP, the third-party was required to first execute and deliver to WebMD a non-disclosure agreement ("NDA") by which, among other things, it agreed that "it will not use any of WebMD's Confidential Information [(the NDA Confidential Information being referred to as "Publication Confidential Information")] for any purpose except for the Authorized Purpose," "[Publication] Confidential Information" being defined as information relating to the production and distribution of the Magazine and other WebMD publications.

65.     By NDA dated July 15, 2016, Time Inc. agreed to the foregoing and other restrictions.

66.     In reliance on the NDA, WebMD disclosed Publication Confidential Information to Time Inc. about the Magazine and other of its publications, including projected print runs, distribution plans, financial information, content and editorial, focus and strategy, and advertiser requirements.

67.     In response to the RFP, Time Inc. delivered to WebMD a proposal both orally, and in a PowerPoint presentation captioned "WebMD + Time Inc. – Better Together – Setting a New Standard in Health & Wellness Content."

68.     Other companies submitted proposals to WebMD as well.

69.     WebMD ultimately decided to retain another party to provide the services outlined in the RFP.

**G.     Anderson Works With Time Inc. To Launch A Competitive Business**

70.     In the February 27, 2017 edition of *min, Media Industry Newsletter* (the "MIN Article"), during the Restricted Period, Time Inc. announced that it "has launched Time Health, a

multimedia brand with plans to build upon the company's health and wellness journalism" (the "Time Health Project").

71.     The article went on to say, "Time Inc. also announced it'll introduce point-of-care magazines to waiting rooms that see over 900 million patient visits annually."

72.     The Time Inc. health-related website and the point-of-care health-focused magazine distributed through physicians' offices compete directly with WebMD's online properties and the WebMD Magazine. Upon information and belief, the "point-of-care" health-focused magazine introduced by Time Inc. mirrored the WebMD Magazine offering and is precisely the business and distribution model for the WebMD Magazine.  Besides offering condition-specific opportunities for advertisers in a special interest publication that was distributed free of charge through the physician's office, Time Inc. also offered targeted distribution based on information regarding physician practices and a sophisticated quantitative research capability that measured the effectiveness of the publication for its advertisers, all of which WebMD utilizes in its WebMD Magazine campaigns.

73.     The MIN Article also quoted Anderson directly, who, speaking for Time Inc., said the following:  "'We plan to launch condition-specific and healthy lifestyle topics throughout 2017 and are actively in the market engaging advertisers and strategic partners,' Heidi Anderson, SVP of sales at Time Inc., says."

74.     As set forth in the MIN Article and Anderson's statements in it, Anderson has breached the March Letter Agreement and the Agreements by working on and launching the Time Health Project, and Time Inc. interfered with the March Letter Agreement and the Agreements, and breached its NDA with WebMD in doing so as well.

75.     Instead of refraining from working on health-related properties of Time Inc. during the Restricted Period, with Time Inc.'s knowledge, approval and at its direction, Anderson spearheaded the launch of a health-related project intended to directly compete with WebMD's online health-related properties and the WebMD Magazine, and, upon information and belief, used Confidential Information to do so.

76.     In direct breach of the March Letter Agreement, Anderson was also put in charge of the Healthcare Sales Leads Category, at least for Time Inc.'s InStyle and Stylewatch publications. Upon information and belief Anderson has breached her agreement not to directly or indirectly solicit the healthcare related companies listed on Attachment B to the March Letter Agreement by discharging her responsibilities for these publications.

77.     According to a recent report in Digiday entitled "Inside Time Inc.'s bumpy yearlong sales overhaul," in January 2016 Time Inc.'s senior management introduced a new sales structure which sold advertising based on ad category across all Time Inc. properties, rather than based on individual publication title.   This reorganization started with three categories, including pharmaceuticals (i.e., healthcare), Anderson's specialty.

78.     Upon information and belief, Anderson has sold advertising in the healthcare categories for all Time Inc. properties and has solicited customers prohibited by the March Letter Agreement, in violation of that agreement.

79.     WebMD took all steps reasonable and necessary to protect its confidential information and its business model and methods by entering into (i) the restrictive covenant, non-solicitation and non-competition agreements with Anderson before and throughout her employment by WebMD, (ii) the March Letter Agreement with Anderson before she left WebMD to join Time

Inc, and (iii) the NDA with Time Inc. before disclosing Confidential Information about the Magazine and its business.

80.     Both Anderson and Time Inc. knew, understood and expressly agreed that they would not use any Confidential Information of WebMD, that Anderson could not work on any health related properties of Time Inc. and could not solicit specified customers for a period of at least one year after she left WebMD.

81.     Upon information and belief, Anderson breached her restrictive covenant, non-competition and non-solicitation agreements and the March Letter Agreement by working on and launching a health-related property at Time Inc. and taking responsibility for Healthcare sales leads for Stylewatch, InStyle and other properties during her Restricted Period.

82.     Upon information and belief, Time Inc. used Confidential Information it learned from Anderson in breach of her agreements with WebMD about which it had express knowledge, and Publication Confidential Information it learned from WebMD during the RFP process in breach of its NDA with WebMD.

83.     In addition to any other relief to which the WebMD is entitled, the Restricted Period as it relates to Anderson should, as provided for in the Agreements, be extended for a period of time equal to the period during which she breached the restrictions contained in those agreements.

84.     WebMD invested millions of dollars and years of work in developing and fine-tuning its business model and methods for the profitable publication and distribution of the WebMD Magazine and as it relates to its health-focused websites.

85.     It would cost millions of dollars and take several years for Time Inc. to replicate what it was able to learn from the Confidential Information taken by Anderson from WebMD and used on behalf of Time Inc. and the Publication Confidential Information disclosed by WebMD after

execution and delivery of the NDA, and to develop the know-how and technical knowledge that Anderson possessed because of her employment with WebMD, none of which Anderson was permitted to use on Time Inc.'s behalf.

86.     Time Inc. breached the NDA, and caused Anderson to breach the other various Agreements she executed and delivered to WebMD, in order to jump start the Time Health Project and get it to market quicker and less expensively than would ordinarily be required, at the expense of WebMD, its direct competitor in the health-related publication sphere.

87.     Upon information and belief, until its launch of the Time Health Project, Time Inc. had never operated a health-focused website or published a magazine like the Magazine, specifically and primarily intended for distribution in physician and health care provider waiting rooms, and primarily for advertising by pharmaceutical and medical industry companies, including those Anderson agreed not to solicit in the March Letter Agreement.

88.     While nothing prohibited Time Inc. from introducing and developing a business to compete with WebMD, it was not free to do so unfairly, and in particular, by inducing Anderson to breach her Agreements with WebMD, by breaching the NDA itself, and by using Confidential Information of WebMD.

## AS AND FOR A FIRST CAUSE OF ACTION
**(Against Anderson For Breach Of The March Letter Agreement And Related Agreements)**

89.     WebMD repeats and realleges the allegations set forth in paragraphs 1 through 88 above as if fully set forth herein.

90.     The restrictions on Anderson's employment and solicitation of customers and employees set forth in the restrictive covenant, non-solicitation and non-competition agreements she delivered to WebMD, as modified by the March Letter Agreement, are reasonable in scope and duration, and are necessary to protect WebMD's legitimate interests.  They are the result of

WebMD's agreement to narrow the scope of the restrictions to which Anderson had previously agreed, in exchange for Anderson's promises to limit the nature and scope of her responsibilities at Time Inc. to those that are not health-related, her promise to provide notice to WebMD if those responsibilities changed during the Restricted Period, and her promises to abide by the restrictions in the March Letter Agreement and all other agreements not modified thereby.

91.     By her work during the Restricted Period on the launch of the Time Health Project – a Time Inc. health-related property – and her assuming other duties concerning health-related properties, both in print and on-line, Anderson has breached the non-compete and non-solicitation restrictions of her agreements, as modified by the March Letter Agreement.

92.     By these breaches Anderson has given an unfair head start to Time Inc.:  in sharing her invaluable know-how and experience, and WebMD's trade secrets and confidential information, Time Inc. obtained a corresponding savings of the time and expense otherwise required to launch and grow the Time Health Project.  This head start was precisely the sort of advantage the March Letter Agreement was designed to prevent.

93.     Upon information and belief, Anderson has also used Confidential Information for the benefit of Time Inc. in breach of her contractual obligations.

94.     Upon information and belief, Anderson appears to have solicited WebMD employees for positions at Time Inc. in breach of her contractual obligations.

95.     By reason of the foregoing breaches WebMD has suffered damages in an amount to be proved at trial, but which are no less than $1,000,000, and include recoupment of the RS-Option Exercise Profit, lost profits, damage to goodwill, diminution in value of any and all Confidential Information used in connection with Anderson's employment at Time Inc., and the cost to WebMD of compiling and maintaining all such Confidential Information shared by Anderson with Time Inc.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Against Anderson And Time Inc. For Trade Secret Misappropriation)

96.     WebMD repeats and realleges the allegations set forth in paragraphs 1 through 95 above as if fully set forth herein.

97.     The Confidential Information to which Anderson had access by reason of her responsibilities at WebMD and the Publication Confidential Information that WebMD shared with Time Inc. pursuant to the terms and protections provided by the NDA constitute trade secrets, as described above.

98.     Until Anderson misappropriated this information, it was not known outside of WebMD other than on limited bases and pursuant to nondisclosure agreements, and was known within WebMD on a need to know basis, by employees who were subject to written agreements requiring that they maintain the confidentiality of this information.

99.     WebMD has developed this information over an extended period of time and has spent millions of dollars in doing so.  As such, this information is of enormous value to WebMD and would be of enormous value to its competitors.  By using this information WebMD's competitors can avoid the time and expense which otherwise would be required to develop their own business models and methods, and can jump to the front of the competitive pack.

100.     As set forth above, WebMD has developed this information over a 12-year period and at considerable expense.  It cannot be easily or properly acquired or duplicated by others, except by similar expenditures of time and money.

101.     Time Inc. is using WebMD's trade secrets in breach of its NDA with WebMD, and by inducing Anderson to provide this and other information, in breach of her agreements with WebMD

102.     Anderson is using WebMD's trade secrets in breach of her several confidentiality agreements with WebMD.

103.    WebMD is entitled to recover its damages from this misappropriation, in an amount to be proved at trial, but which are not less than $1,000,000.  These damages may include WebMD's losses, including its costs of developing these trade secrets; benefits unjustly received by Anderson from her misuse of these trade secrets for the benefit of Time Inc; and/or the amount of a reasonable royalty for use of these trade secrets.

### AS AND FOR A THIRD CAUSE OF ACTION
#### (Against Time Inc. For Tortious Interference)

104.    WebMD repeats and realleges the allegations set forth in paragraphs 1 through 103 above as if fully set forth herein.

105.    The March Letter Agreement is a valid contract between Anderson and WebMD.

106.    Time Inc. knew about the March Letter Agreement as it was being negotiated and once it was executed.  Among other things, Anderson advised WebMD that she had to discuss with Time Inc. certain terms being negotiated with WebMD.  In addition, Anderson signed the March Letter Agreement and by doing so she "acknowledge[d] that [she had] provided a copy of this letter to Time."

107.    Time Inc. intentionally induced Anderson to breach the March Letter Agreement by soliciting her to become involved with the Time Health Project during the Restricted Period, in order to take advantage of the head start she would provide for this project by reason of her extensive knowledge of WebMD's trade secret and confidential information, and invaluable know-how and experience with the growth and development of the Magazine.

108.    Anderson could have worked on Time Inc. properties unrelated to health and she would not have breached the March Letter Agreement.

109.    But for Time Inc.'s inducement and interference Anderson would not have breached the March Letter Agreement.

110.     By reason of the foregoing, WebMD has suffered damages in an amount to be proved at trial, but which are not less than $1,000,000.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Against Time Inc. For Breach Of Its NDA With WebMD)

111.     WebMD repeats and realleges the allegations set forth in paragraphs 1 through 110 above as if fully set forth herein.

112.     Upon information and belief, Time Inc. was likely considering the launch of the Time Health Project by July 15, 2016, the date as of which it agreed to the NDA with WebMD, but failed to disclose to WebMD any of its plans for this project.

113.     As evidenced by WebMD's insistence that Time Inc. sign the NDA, which prohibited Time Inc. from using WebMD's Publication Confidential Information for any purpose except for the production and distribution of the Magazine and other WebMD publications, WebMD never would have shared its Publication Confidential Information with Time Inc. had it known that Time Inc. was or would be working on the launch of a publication which would compete directly with WebMD's properties.

114.     Despite Time Inc.'s promises in the NDA, Time Inc. has used WebMD's Publication Confidential Information for its development and production of the Time Health Project.

115.     Time Inc. has breached the NDA by its use of WebMD's Publication Confidential Information for a purpose other than the Authorized Purpose.

116.     WebMD has suffered damages as a result in an amount to be proved at trial, but which are not less than $1,000,000 on account of Time Inc.'s breach of the NDA

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Against Time Inc. For Unfair Competition)

117.     WebMD repeats and realleges the allegations set forth in paragraphs 1 through 116 above as if fully set forth herein.

118.    By Time Inc.'s employment of Anderson so as to obtain and exploit the advantage of her know-how and experience with WebMD and her knowledge of WebMD's valuable trade secret information it has misappropriated WebMD's commercial advantage, and its labor, skill, expenditures and good will.

119.    Such a bad faith misappropriation constitutes unfair competition.

120.    WebMD has suffered and will suffer damages as a result of Time Inc.'s unfair competition in an amount to be proved at trial, but which is not less than $1,000,000, that amount being equal to the reasonable value of the information Time Inc. unfairly misappropriated from WebMD.  Such damages also include those flowing from the unfair head start obtained by Time Inc. from Anderson, made possible by its employment of Anderson and its use of her invaluable know-how and experience and knowledge of WebMD's trade secrets and Confidential Information, and the corresponding savings of the time and expense otherwise required to launch and grow the Time Health Project, an advantage the March Letter Agreement was designed to prevent.  In addition, WebMD may recover the profits lost by reason of Time Inc.'s improper conduct, or the profits made by Time Inc. attributable to its wrongful conduct.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Against Time Inc. For Unjust Enrichment)

121.    WebMD repeats and realleges the allegations set forth in paragraphs 1 through 120 above as if fully set forth herein.

122.    Time Inc. has misappropriated for itself the benefits of Anderson's know-how and experience and the Confidential Information and trade secrets of which she has knowledge. Anderson's know-how and this Confidential Information and trade secrets were developed by WebMD with significant expenditures of time, skills, labor and monetary cost.  Time Inc. has acquired these benefits without compensating WebMD and at WebMD's expense.

123.    Time Inc. has been unjustly enriched by this misappropriation and it would be unjust and against equity and good conscience for Time Inc. to retain these benefits.

124.    Time Inc. must provide restitution for what it has acquired without having to pay the costs associated with the development of the valuable information obtained from WebMD.

125.    Time Inc. has been unjustly enriched in an amount to be proved at trial, but which not less than $1,000,000, including unjust enrichment flowing from the unfair head start obtained by Time Inc., made possible by its use of WebMD's Publication Confidential Information, and the corresponding savings of the time and expense otherwise required to launch and grow the Time Health Project.

126.    WebMD is entitled to recover an amount to be proved at trial, but which is not less than $ 1,000,000.

WHEREFORE, WebMD demands judgment as follows:

A.    On the First Cause of Action, (i) awarding WebMD an amount not less than $1,000,000, plus appropriate interest; and (ii) extending the Restricted Period for an amount of time equal to the period of time during which Anderson breached the several restrictions to which she agreed;

B.    On the Second Cause of Action, awarding WebMD its damages from Anderson's and Time Inc.'s misappropriation of trade secrets and Confidential Information in an amount to be proved at trial, but which are not less than $1,000,000, plus appropriate interest;

C.    On the Third Cause of Action, awarding WebMD its damages from Time Inc.'s tortious interference with contract in an amount to be proved at trial, but which are not less than $1,000,000, plus appropriate interest;

D.      On the Fourth Cause of Action, awarding WebMD its damages from Time Inc.'s breach of the NDA in an amount to be proved at trial, but which are not less than $1,000,000, plus appropriate interest;

E.      On the Fifth Cause of Action, awarding WebMD its damages from Time Inc.'s unfair competition in an amount to be proved at trial, but which amount is not less than $1,000,000, plus appropriate interest;

F.      On the Sixth Cause of Action, awarding WebMD the amount by which Time Inc. has been unjustly enriched, which amount is not less than $1,000,000, plus appropriate interest; and

G.      On all Causes Of Action, for such other further and different relief as the Court may deem just and proper.

## **JURY DEMAND**

WebMD hereby demands trial by jury of all issues so triable.

Dated:      New York, New York
            May 18, 2017

                                    BROWNE GEORGE ROSS LLP


                                    By:___s/Jeffrey A. Mitchell_____
                                           Jeffrey A. Mitchell
                                           Judith R. Cohen
                                    5 Penn Plaza, 24th Floor
                                    New York, New York 10001
                                    Telephone:  (212) 413-2600
                                    Fascimile:  (212) 413-2629
                                    jmitchell@bgrfirm.com
                                    jcohen@bgrfirm.com
                                    *Attorneys for Plaintiff*